# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2986-22

N.K.,[1]

      Plaintiff-Appellant/
Cross-Respondent,

v.

A.D.,

      Defendant-Respondent/
Cross-Appellant.

_____

> Argued December 10, 2024 – Decided February 11, 2025
>
> Before Judges Firko and Augostini.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-1363-23.
>
> Adam C. Brown (Law Offices of Adam C. Brown, Esq. PC) argued the cause for appellant/cross-respondent.
>
> Marisa Lepore Hovanec argued the cause for respondent/cross-appellant (Hovanec & Divito, LLC,

---

[1] We use initials to protect the confidentiality of these proceedings. R. 1:38-3(d)(10).

attorneys; Marisa Lepore Hovanec, of counsel and on the briefs).

PER CURIAM

Plaintiff N.K. appeals from the May 30, 2023, amended final restraining order (FRO) denying her request for counsel fees as compensatory damages, N.J.S.A. 2C:25–29(b)(4), following the entry of an FRO pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35 entered on March 22, 2023. Defendant A.D., plaintiff's husband, cross-appeals from the May 30, 2023, amended FRO denying his request for reconsideration of the March 22, 2023 FRO entered against him under the PDVA based on the predicate act of harassment, N.J.S.A. 2C:33-2(a).

Plaintiff contends the court erred by denying counsel fees as compensatory damages after the court granted her request for an FRO against defendant. Defendant argues there was insufficient evidence supporting the court's findings that he committed the predicate act of harassment, and the second prong of the Silver[2] analysis was satisfied. Defendant further contends the court abused its discretion by proceeding at trial without defendant's subpoenaed witnesses, by denying reconsideration, and by declining to consider

---

[2] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

A-2986-22

alleged exculpatory evidence. Having reviewed the record and the applicable law, we reverse and remand for a new trial.

I.

The facts were established at a one-day bench trial and from the motion hearing following trial. The trial was initially scheduled for February 7, 2023. The defendant subpoenaed two police officers who appeared in court on that date. However, the trial was adjourned to February 22, 2023. The trial was adjourned once more because plaintiff needed additional time to obtain a new attorney.

On March 22, 2023, the court conducted the final restraining order hearing, and both parties were represented by counsel. Plaintiff testified on her own behalf and called one witness, her brother, A.K. Plaintiff also introduced exhibits into evidence. Defendant testified on his own behalf and called no witnesses, although he had subpoenaed two police officers who did not appear on the day of trial. In lieu of their testimony, defendant, with plaintiff's consent, offered into evidence the officer's report from the date of the incident, which the court accepted.

Plaintiff and defendant were married in 2013. They have one child, a son, who was three years old at the time of trial. The parties were living together

3

and going through a divorce during the time of the incident on December 8, 2022. Plaintiff had filed for divorce in approximately September or October 2022. The divorce matter, which involves a contentious custody claim, was pending at the time of the FRO hearing.

Plaintiff testified about an incident on December 8, 2022, that led her to obtain a temporary restraining order (TRO). She claimed defendant came into the room while she was preparing their child for daycare, and an argument ensued. Plaintiff left the room, and defendant followed her around the house. Plaintiff testified that defendant came within close proximity to her, and she asked him to leave. After returning to the room, she closed the bedroom door and locked it. Plaintiff explained that defendant was angry, shouting at her to open the door, which she refused to do. After banging on the door, defendant picked the lock with a hanger and broke open the door.

Plaintiff testified that she asked defendant to leave and shut the door and locked it again. Defendant picked the lock, opening the door twice more according to plaintiff. Plaintiff then called her brother, A.K., who advised her to call the police. Plaintiff and the child remained in the locked room until the police arrived.

A-2986-22

The police arrived shortly thereafter and spoke to both parties. The officers documented the incident. Defendant told them he would leave the residence and not return because of what had happened.

Plaintiff testified to several prior incidents, beginning with an incident in May 2022. On that day, when she returned after picking up their son from day care, defendant began following her around the house and "suddenly [he] pulled me back by my hair." Plaintiff further testified she started yelling at defendant, and then, "in anger," defendant threw a plate in front of her, causing it to break into pieces "all around me." According to plaintiff, defendant pushed her against the washer/dryer, pinning her by her right broken clavicle and hitting her in the back.

Plaintiff explained that about a month after she filed for divorce, defendant had repeatedly banged on the entry-way door, the washer/dryer, and patio doors multiple times during the night, waking up both she and their son at inconvenient hours. Plaintiff testified regarding another incident in October 2022. While plaintiff and their son were sleeping, defendant entered the bedroom and began vigorously shaking plaintiff and yelling out her name, forcing her awake.

A-2986-22

Plaintiff testified to other incidents prior to 2022. Specifically, she described an incident in August 2018 when defendant pushed her by her broken right clavicle. She also testified about an incident in July 2017, where she alleged defendant, in a "fit of rage," grabbed hold of her neck during an argument. Plaintiff also testified about an incident in July 2015, when defendant "slapped me across my face."

Following the incident on December 8, 2022, plaintiff obtained a TRO, alleging the predicate acts of harassment, criminal restraint, and false imprisonment. She explained that defendant has been "physically, emotionally, and mentally abusive throughout the marriage."

Plaintiff's brother, A.K., testified on plaintiff's behalf and explained he received a call from plaintiff during the incident on December 8, 2022. He described plaintiff as "crying and pretty scared," and she relayed that defendant "is trying to break open the door." According to A.K., plaintiff, crying, stated, "help me, help me, help me." A.K. testified that he could hear defendant screaming, "open the door, open the door." He then heard the click of a lock opening. A.K. advised plaintiff to call the police.

A-2986-22

After the December 8, 2022 incident, A.K. testified defendant immediately called him after the police left. A.K. explained defendant "threatened me that he won't spare any of us because she called the cops."

A.K. testified that in May 2022, plaintiff called him and told him that defendant "pulled her hair" and punched her in the back. Three days after this incident, defendant called A.K. and apologized to him for the incident. Although defendant claimed he did not remember what happened, A.K. testified that defendant told him "it happened in a point of rage and he hit her."

Following the close of plaintiff's case, defendant testified. Defendant denied many of the past incidents testified to by plaintiff. Specifically, defendant did not recall ever slapping plaintiff in the past but asserted plaintiff had slapped him "multiple times . . . ." He denied putting his hands on her neck. Defendant also denied plaintiff's assertion that he constantly harassed her about the divorce. He acknowledged frequently speaking with plaintiff about the divorce to try and "make things better."

With respect to the May 2022 incident, defendant testified he asked plaintiff not to leave the residence, and she "slapped me twice." Defendant contended he tried to stop plaintiff from leaving, went behind her and, with a plate in his hand, "came in excitedly." Defendant acknowledged that because

7

he was trying to stop her from behind, "her hair got pulled a little." He also admitted that "in frustration [he] threw the plate down." On cross-examination, defendant acknowledged that they both spit at each other.

Defendant admitted that in October 2022, he went into the bedroom late at night to speak with her and "try to make things better." When questioned about the October 2022 incident, defendant explained:

> [Defendant's Counsel]: Okay. She said you vigorously shook her and called out to her loudly.
>
> [Defendant]: No, this is –
>
> [Defendant's Counsel]: What happened? Yeah, what happened on that date?
>
> [Defendant]: This is 6th of October, things were really bad. I was trying to go in, I did go in late at night. I tried to speak to her to try to make things better. I have text messages, the text messages also say can we please work together, can we get this sorted out.
>
> And if you think a person is going to speak to someone like this about this, trying to make things better, you're going to vigorously shake someone. I was just like, like doing this, doing this, to wake her up to talk to her.
>
> [Defendant's Counsel]: Okay. [A]nd then what happened after that? Did she wake up?
>
> [Defendant]: My son also started shaking a little. So then she started, then like she said, he's getting up.

 A-2986-22

[Defendant's Counsel]: How did that incident conclude?

[Defendant]: Nothing happened.

[Defendant's Counsel]: Nothing happened?

[Defendant]: Nothing.

[Defendant's Counsel]: Okay. So you woke her up. She went back to sleep?

[Defendant]: Yes.

[Defendant's Counsel]: Okay, after that –

[Plaintiff's Counsel]: Your Honor I'd just like the record to reflect he was gesturing hitting his face when he was trying—

Defendant testified that on December 8, 2022, plaintiff "started being aggressive" and yelled at him. An argument ensued, and plaintiff began calling him derogatory names. After plaintiff went back into the bedroom and locked the door, defendant acknowledged taking the hanger from the cupboard and opening the door with the hanger. He admitted having done this "to speak to her multiple times;" however, he acknowledged that plaintiff did not want him to enter the room.

Defendant testified that he was telling plaintiff to take the child to daycare. He explained that he agreed to leave the house if she wanted him to, but plaintiff

9

then called the police. When the police arrived, defendant told the officers that he would leave the house and stay elsewhere.

Defendant subpoenaed the two officers who came to the home on December 8, 2022, to testify regarding the incident and their interactions with the parties. Neither officer appeared in court on the day of trial. Defense counsel attempted to reach out to the officers to find out their status. At one point, the court took a short recess to contact police headquarters and determine personally whether the officers had been dispatched to the courthouse. The following exchange occurred after the brief recess:

> THE COURT: All right. We are back on the record on FV-12-1363-23. No other witnesses? Counsel, you had an application with regard to the police reports?
>
> [Defendant's Counsel]: Yes. I want to admit what's been pre-marked as [d]efense [e]xhibit 1. I've shown a copy to opposing counsel. I'm ready to give that to him. This is the police report drafted by the incident as discussed earlier in open court. I did have them subpoenaed. They were, two officers were present both times, as I understand it. Opposing counsel is willing to waive any and all objections to their entry into evidence.
>
> [Plaintiff's Counsel]: Agreed.
>
> THE COURT: Okay. D-1 and D-2. You know what? Is it two pages? So we'll mark that as D-1.

Counsel next delivered closing arguments.

Following a short recess during which the court reviewed the evidence, the court rendered its decision, finding first jurisdiction based on the parties' marital status. Having found no evidence that defendant committed the predicate acts of criminal restraint, pursuant to N.J.S.A. 2C:13-2,[3] or false

---

[3] N.J.S.A. 2C:13-2 provides:

> A person commits a crime of the third degree if he knowingly:
>
> a. Restrains another unlawfully in circumstances exposing the other to risk of serious bodily injury; or
>
> b. Holds another in a condition of involuntary servitude.
>
> The creation by the actor of circumstances resulting in a belief by another that he must remain in a particular location shall for purposes of this section be deemed to be a holding in a condition of involuntary servitude.
>
> In any prosecution under subsection b., it is an affirmative defense that the person held was a child less than [eighteen] years old and the actor was a relative or legal guardian of such child and his sole purpose was to assume control of such child.

A-2986-22

imprisonment, pursuant to N.J.S.A. 2C:13-3,[4] the court dismissed those predicate acts.

With respect to the remaining allegation of harassment, pursuant to N.J.S.A. 2C:33-4, the court found "the credibility of both parties . . . not at a high level." The court explained,

> [b]oth parties were rambling, unresponsive, didn't answer the question, wanted to just talk about what they wanted to talk about. And so it was very difficult to make a determination as to [whether] one party [is] more credible than the other party.

The court summarized the parties' testimony as to what occurred on December 8, 2022, and noted the areas of "common ground." The court found that defendant admitted using a hanger to gain access to the room where plaintiff was, presumably to talk to their son or plaintiff. However, the court concluded:

> [The court] find[s] that three times going into a locked door, using a hanger to essentially break into the

---

[4] N.J.S.A. 2C:13-3 provides:

> A person commits a disorderly persons offense if he knowingly restrains another unlawfully so as to interfere substantially with his liberty. In any prosecution under this section, it is an affirmative defense that the person restrained was a child less than [eighteen] years old and that the actor was a relative or legal guardian of such child and that his sole purpose was to assume control of such child.

door to carry on a dispute with the plaintiff, [the court] find[s] that the only thing [the court] can attribute that to is the attempt to annoy and alarm the plaintiff. She was annoyed and alarmed. [The court] finds that therefore that's harassment.

Having found defendant committed the predicate act of harassment, the court addressed the second prong of Silver, whether an FRO was necessary for the protection of plaintiff. 387 N.J. Super. at 126-27. Again, the court noted, "the credibility of both parties is not the greatest . . . ." Accordingly, the court found both parties "lacking somewhat in credibility." Focusing on the areas where the parties' testimony coincided, the court concluded in October 2022, defendant entered the bedroom at 1:30 a.m., waking plaintiff up to continue an argument.

The court also found that in May 2022, defendant acknowledged grabbing plaintiff's hair, and defendant indicated "he put his hand around her neck on that day as well . . . ." The court found two prior instances of domestic violence and thus, concluded the second prong of the Silver analysis had been satisfied.

The court issued an FRO against defendant and in favor of plaintiff, granting plaintiff exclusive possession of the marital residence and temporary custody of the parties' child. The court directed defendant to pay his share of

daycare costs, utility and mortgage expenses. The court also maintained the parties' parenting time schedule.

On April 11, 2023, defendant, now represented by a new attorney, filed a motion for reconsideration, contending his prior attorney failed to produce two audio recordings of the incident on December 8, 2022, which countered plaintiff's assertions. Defendant urged the court to reconsider its decision to issue an FRO because the court's findings were unsupported by the trial testimony. On April 18, 2023, plaintiff filed opposition and a cross-motion seeking attorney's fees—for the first time—in the amount of $11,807.

On May 30, 2023, the parties appeared for oral argument, and defendant brought the recordings and requested the court consider the proffered evidence before ruling on the reconsideration motion. The court did not permit defendant to play the recordings, nor did the court listen to the recordings prior to ruling on the motion. The court found the recordings were not "new" evidence because they had been available at the time of trial. Therefore, the court denied defendant's motion for reconsideration.

The court also denied plaintiff's attorney's fee request because the application was not made at the conclusion of the FRO hearing, which the court

stated was "required." On May 30, 2023, the court amended the FRO to reflect its decision on these motions.

On June 5, 2023, plaintiff filed an appeal, and defendant filed a cross-appeal on June 21, 2023. On June 28, 2023, the trial court issued an amplification of its decision pursuant to Rule 2:5-1(d). The court reiterated the procedural and factual history but did not further address the recordings defendant urged the court to consider. The court expounded on its reasoning for denying plaintiff's request for an award of counsel fees as compensatory damages[5] pursuant to the PDVA. The court noted that counsel fees, while permissible, are not mandatory.

---

[5] In relevant part, N.J.S.A. 2C:25-29(b)(4) provides:

> Compensatory losses shall include, but not be limited to, loss of earnings or other support, including child or spousal support, out-of-pocket losses for injuries sustained, cost of repair or replacement of real or personal property damaged or destroyed or taken by the defendant, cost of replacing locks pursuant to section 2 of L. 2023, c. 174, cost of counseling for the victim, moving or other travel expenses, reasonable attorney's fees, court costs, and compensation for pain and suffering. . . .

II.

Our review of a "trial court's fact-finding function is limited." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)).

We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we review de novo the "[trial] court's interpretation of the law and the legal consequences that flow from established facts," and do not accord such deference to the court's legal conclusions. Accounteks.Net, Inc. v. CKR L., LLP, 475 N.J. Super. 493, 503 (App. Div. 2023) (quoting Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)); Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

We review both a trial court's decision on a motion for reconsideration and on whether to award attorney's fees for an abuse of discretion. Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 383 (App. Div. 2015); Myron Corp. v. Atl. Mut. Ins. Corp., 407 N.J. Super. 302, 309 (App. Div. 2009).

On appeal, plaintiff contends the court erred in denying her request for attorney's fees as compensatory damages under the PDVA. Defendant contends the trial court erred in issuing an FRO against him and in denying reconsideration of that decision. He asserts three main points, alleging the trial court erred by: (1) finding that defendant committed the predicate act of harassment and the second prong of Silver, both of which were against the weight of the evidence; (2) allowing the trial to proceed without defendant's subpoenaed witnesses; and (3) denying reconsideration or a rehearing and in particular, by declining to listen to and consider the audio recordings of the December 8, 2022, incident. We begin our analysis with defendant's cross-appeal, challenging the court's issuance of an FRO and denial of defendant's motion for reconsideration.

In deciding whether to grant an FRO, a trial court must engage in the two-step inquiry delineated in Silver, 387 N.J. Super. at 125-27. "First, the judge

17

must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125. The judge must construe any such alleged acts in light of the parties' history to better "understand the totality of the circumstances of the relationship and to fully evaluate the reasonableness of the victim's continued fear of the perpetrator." Kanaszka v. Kunen, 313 N.J. Super. 600, 607 (App. Div. 1998); N.J.S.A. 2C:25-29(a)(1).

Second, after finding a predicate act, the judge must determine whether a restraining order is necessary to protect the plaintiff from immediate harm or further abuse. Silver, 387 N.J. Super. at 127. "[T]he guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6) . . . . " Ibid. Those factors which the court should consider include, but are not limited to:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;

(5)   In determining custody and parenting time the protection of the victim's safety; [and]

(6)   The existence of a verifiable order of protection from another jurisdiction.

[N.J.S.A. 2C:25-29(a).]

Although the court is not required to incorporate all these factors in its findings, "the [PDVA] does require that 'acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence between the parties.'"  Cesare, 154 N.J. at 402 (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995)).  Moreover, whether a restraining order is necessary depends upon the seriousness of the predicate offense, on "the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse[,]" and on "whether immediate danger to the person or property is present."  Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995).

In evaluating the totality of the circumstances, the court must exercise care to "distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence."  R.G. v. R.G., 449 N.J. Super. 208, 225 (App. Div. 2017).  A trial court must be particularly vigilant in situations where domestic violence allegations arise in

A-2986-22

the context of the dissolution of a marriage or long-term partnership because as we underscored in <u>Peranio</u>, "the fact of the matter is that the dissolution of a marriage is rarely a happy event. All parties suffer and even the most rational are hard pressed to avoid any emotional encounters." <u>Peranio</u>, 280 N.J. Super. at 56.

A. <u>Trial Errors.</u>

Defendant contends the trial court erred in finding the predicate act of harassment and the need for an FRO under the second prong of the <u>Silver</u> analysis. Defendant further asserts error by the trial court in proceeding with the trial without the subpoenaed officers present to testify.

<u>Proceeding Without Subpoenaed Police Officers</u>

The issue of proceeding without the subpoenaed police officers' testimony was not raised before the trial court; in fact, the attorneys had agreed, in lieu of the officers' testimony, to admit the police report from the date of the incident. We generally will not consider an argument which was not raised before the trial court. <u>See</u> <u>Selective Ins. Co. of Am. v. Rothman</u>, 208 N.J. 580, 586 (2012). Because defendant did not object to proceeding without the officers, we review this issue for plain error.

Plain error is an error "clearly capable of producing an unjust result." R. 2:10-2. "Relief under the plain error rule, R. 2:10-2, at least in civil cases, is discretionary and 'should be sparingly employed.'" Baker v. Nat'l State Bank, 161 N.J. 220, 226 (1999) (quoting Ford v. Reichert, 23 N.J. 429, 435 (1957)).

> A defendant who does not raise an issue before a trial court bears the burden of establishing that the trial court's actions constituted plain error because "to rerun a trial when the error could easily have been cured on request[] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal."
>
> [State v. Santamaria, 236 N.J. 390, 404-05 (2019) (alteration in original) (quoting State v. Ross, 229 N.J. 389, 407 (2017)).]

Moreover, because defendant proffered the evidence in lieu of live testimony, the doctrine of invited error also applies. "'[T]he doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error.'" N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 340 (2010) (quoting Brett v. Great Am. Recreation, 144 N.J. 479, 503 (1996)).

We further recognize the general rule: "a trial court is afforded 'considerable latitude regarding the admission of evidence,' and [should] be reversed only if the court abused its discretion." State v. Jackson, 243 N.J. 52,

21

65 (2020) (citing State v. Nelson, 173 N.J. 417, 470 (2002)); see also State v. J.A.C., 210 N.J. 281, 295 (2012).

Here, the court acknowledged that defendant had properly subpoenaed the officers, and they had appeared at a previously scheduled hearing date, which was adjourned. However, on the new hearing date, the officers failed to appear, and the court attempted to locate them by calling police headquarters. Because the officers could not be located, the parties mutually agreed to the admissibility of the police report, and defendant did not request an adjournment. Only now on appeal, does he argue that the court should have "sua sponte" adjourned the matter. It also does not appear that the court relied upon the officer's report in its decision. Thus, under these circumstances, we decline to find plain error.

Predicate Act of Harassment

At the conclusion of the trial, the court found defendant committed the predicate act of harassment. While the court did not specify which subsection of the harassment statute applied to its findings, the court referred to defendant's conduct of repeatedly using a hanger to break into plaintiff's room as an attempt to "annoy and alarm plaintiff."

Harassment is often the most challenging for a trial court to discern. "[A] party's accusation that another's actions are 'harassing' [may be] vague and

22

conclusory, making it particularly difficult for a trial court to discern on which side of the line running between domestic violence and ordinary 'contretemps' a particular act properly falls." J.D., 207 N.J. at 482.

A person is guilty of harassment under N.J.S.A. 2C:33-4:

> [I]f, with purpose to harass another, [a person]:
>
> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

A finding of harassment requires proof of an intent or purpose to harass. State v. Hoffman, 149 N.J. 564, 576-77 (1997). "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." D.M.R. v. M.K.G., 467 N.J. Super. 308, 323 (App. Div. 2021) (quoting H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003)). "Although a purpose to harass can be inferred from a history between the parties . . . that finding must be supported by some evidence that the actor's conscious object was to alarm or

annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487.

The court recognized that "[i]n circumstances like [these], oftentimes we have one party saying something happened and the other party saying it didn't happen." Thus, credibility was key to the findings made by the court. However, in this case, the court did not find either party particularly credible. We are unable to discern based upon the court's lack of specific findings, whether the court correctly concluded defendant committed the predicate act of harassment.

Second Prong of Silver

The defendant alleges the court erred in finding that plaintiff satisfied the second prong of Silver by concluding there were "two substantiated prior instances in October and May of 2022" of domestic violence. Specifically, defendant contends the court erred by finding defendant admitted to placing his hands around plaintiff's neck in a prior incident of domestic violence.

Initially, when asked on direct examination about the July 2017 incident, and whether he "at any time on that date," had put his hands on her neck, defendant denied having done so. However, during cross-examination, the following colloquy occurred:

> [Plaintiff's Counsel]:  Okay. And did you put your
> hand around her neck?

[Defendant]: Yes.

On redirect, this issue was addressed again:

[Defendant's Counsel]: The incident in the car.

[Defendant]: Yeah.

[Defendant's Counsel]: At any point did you put your hands around her neck?

[Defendant]: No, I don't think so, no, no.

[Defendant's Counsel]: Did you understand the question that was just presented to you? Because he asked you that.

[Defendant]: He did?

[Defendant's Counsel]: Yes. But, I don't think you understood –

[Defendant]: No, no, I didn't understand.

Shortly thereafter, when asked again if "[a]t any point did you physically touch her neck," defendant responded, "[n]o."

While recounting the May 2022 incident of domestic violence, and without explanation, the court found defendant admitted he "put his hand around her neck on that day as well, which also comports with what she has to say." This conclusion was not supported by the credible evidence. The court found the prior incidences of "waking up in the middle of the night, pulling the hair,

25

[and] putting the hand on the throat" led the court to "believe that the plaintiff needs to have [an FRO] in order to protect herself from those type[s] of actions by . . . defendant."

We are unable to discern what, if any, weight the court gave this factual assertion in its analysis of the need for an FRO under the second prong of Silver, and whether, without this fact, the court would have concluded that "a restraining order [was] necessary to protect [] plaintiff from future danger or threats of violence." D.M.R., 467 N.J. Super. at 322 (citing Silver, 387 N.J. Super. at 126-27) ("[T]he guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse."). Thus, we conclude that the court erred in its determination that plaintiff had satisfied the second prong of Silver; namely, that plaintiff had proven that a restraining order was necessary to prevent immediate harm or further acts of abuse. Silver, 387 N.J. Super. at 127.

B. Motion for Reconsideration.

Pursuant to Rule 4:49-2, reconsideration, a matter of discretion, permits the trial court to amend or alter its judgment, where "(1) it has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious

A-2986-22

that the court either did not consider, or failed to appreciate the significant of probative, competent evidence." Kornbleuth v. Westover, 241 N.J. 289, 301 (2020) (quoting Guido v. Duane Morris LLP, 202 N.J. 79, 87-88 (2010)).

A trial court's reconsideration decision will not be disturbed "'unless it represents a clear abuse of discretion . . . .'" Id. (quoting Hous. Auth. of Morristown v. Little, 135 N.J. 274, 283 (1994)). "An abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Pitney Bowes Bank, 440 N.J. Super. at 382 (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)) (internal quotation marks omitted).

Here, the court correctly noted that the audio recordings, which defendant sought to introduce, were not "new evidence." However, other than noting that the recordings were not "new evidence," the court failed to explain why it would not permit defense counsel to play the recordings or why the court did not listen to them prior to ruling. Thus, the court erred in not, at a minimum, considering this evidence, which recorded the parties' interactions during the incident on December 8, 2022. Such evidence may have given the court further context in which to evaluate the parties' relationship and their credibility. We conclude the court abused its discretion by not considering this evidence and "undertak[ing]

27

a second review of the evidence and facts presented . . . ."  Pitney Bowes Bank, 440 N.J. Super. at 383.

Accordingly, because the court made credibility findings and the recordings may have impacted the court's final determination in this matter, we reverse, vacate the FRO and reinstate the TRO of December 8, 2022, pending a new FRO trial.  We take no position on the admissibility of nor the weight to be given to the recordings on remand.

C.  Attorney's Fees.

In her cross-appeal, plaintiff contends the court erred in not awarding attorney's fees as compensatory damages pursuant to N.J.S.A. 2C:25-29(b)(4). An award of attorney's fees is governed by Rule of Professional Conduct 1.5 and Rule 4:42-9(a)(8) and (b).

Because we are vacating the FRO and remanding the matter for a new trial, we need not reach plaintiff's claim that the court erred in not awarding attorney's fees.  Following the conclusion of a new hearing on the plaintiff's domestic violence complaint, plaintiff may timely apply for attorney's fees.

In sum, we vacate the amended FRO entered on May 30, 2023, and reinstate the TRO.  The matter is remanded for a new FRO hearing.  We note that because credibility determinations were made, the FRO hearing on remand must

be heard by a different court.  See Freedman v. Freedman, 474 N.J. Super. 291, 308 (App. Div. 2023).[6]  We take no position on the outcome on the domestic violence trial and counsel fee application on remand.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6]  The judge who issued the FRO and ruled on the motion for reconsideration is now retired, and therefore, the matter will be assigned to a different judge.

A-2986-22